# United States Court of Appeals
## For the First Circuit

No. 17-2211

CYNTHIA L. MERLINI,

Plaintiff, Appellant,

v.

CANADA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Lynch, Kayatta, and Barron,
Circuit Judges.

Theodore J. Folkman, with whom Murphy & King, P.C. was on brief, for appellant.
John F. Cooney, with whom Benjamin E. Horowitz, Venable LLP, D.E. Wilson, Jr., Andrew E. Bigart, and Liz C. Rinehart were on brief, for appellee.

June 10, 2019

BARRON, <u>Circuit Judge</u>.  Cynthia Merlini ("Merlini") is a United States citizen who was injured in the course of her employment as an administrative assistant at the Canadian consulate in Boston, Massachusetts.  The injury occurred in 2009 when she tripped over a cord in the consulate that had not been secured to the floor.  In 2017, as a result of that injury, Merlini sued Canada for damages in the United States District Court for the District of Massachusetts pursuant to the Massachusetts Workers' Compensation Act (the "MWCA"), which is codified at Massachusetts General Laws chapter 152.

The District Court dismissed Merlini's complaint for lack of jurisdiction after concluding that Canada was immune from the suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 <u>et. seq.</u>  We now reverse.

**I.**

In 2003, the government of Canada hired Merlini -- who is a resident of Massachusetts, a citizen of the United States, and not a citizen of Canada -- to be an administrative assistant to the Consul General of Canada in Boston.  Merlini asserts, and Canada does not contest, that her "duties" in this position "were purely clerical, and comparable to the duties of an assistant or secretary to an executive in any private firm," as "[s]he answered the phones, maintained files, typed letters, and did other secretarial work" in the Canadian consulate in Boston.  She further

asserts, again without dispute, that "[s]he was not a consular officer," "[s]he had no governmental, consular, diplomatic, or official duties," "[s]he took no competitive examination before hiring," and "she was not entitled to tenure protections, or to the employment benefits Canadian foreign service officers received."

Merlini alleges that, while setting up coffee and tea service on January 22, 2009 for a meeting at the consulate, she tripped over an unsecured speakerphone cord, fell, struck a credenza, and thereby sustained "a serious injury" that left her unable to work. Canada does not challenge that allegation for the purpose of the present appeal. Additionally, it is undisputed that, per Canada's own national workers' compensation system, Canada paid Merlini what amounted to her full salary from shortly after the accident until October 2009.

Sometime thereafter, however, Canada determined that Merlini was able to return to work and ceased paying her pursuant to its national workers' compensation system. That determination appears to have set matters on the course that has resulted in the suit that is now before us on appeal.

The initial step on that course was Merlini's request that Canada reconsider its determination to stop paying her under Canada's workers' compensation system. Following Canada's denial

of that request for reconsideration, Merlini shifted course and sought relief under Massachusetts law.

Merlini did so first, in 2011, by bringing an administrative claim against the Massachusetts Workers' Compensation Trust Fund ("WCTF").  That fund provides, among other things, for the payment of benefits to employees who are unable to work in consequence of workplace injuries that they have suffered while working for an employer who is subject to personal jurisdiction within the Commonwealth and who is "uninsured" for purposes of the MWCA.  See Mass. Gen. Laws ch. 152 § 65(2)(e). Chapter 152 provides that, to qualify as "insured," an employer must (1) have insurance with an insurer, (2) hold membership in a workers' compensation self-insurance group certified by the state, or (3) be licensed as self-insured annually by the state, which requires the employer, among other things, to complete a detailed application, provide certain financial information, post a surety bond to or deposit negotiable securities with the state to cover any losses that may occur, and purchase catastrophe reinsurance of at least $500,000.  See id. at §§ 1(6), 25A; 452 Mass. Code Regs. 5.00; see also LaClair v. Silberline Mfg. Co., 393 N.E.2d 867, 871 (Mass. 1979).

In 2013, the Massachusetts Department of Industrial Accidents ("DIA") held an evidentiary hearing, in which Canada participated as amicus curiae for the WCTF, on Merlini's claim

against the fund.  An administrative judge found that Merlini was entitled to ongoing incapacity benefits from the fund under chapter 152 § 34 (temporary total incapacity benefits) and chapter 152 § 34A (permanent total incapacity benefits).

The WCTF then appealed this ruling to the DIA's Reviewing Board ("DIA Board").  In 2015, the DIA Board reversed the administrative judge's ruling and denied Merlini the benefits from the fund.  The DIA Board determined that (1) Canada was not "subject to the personal jurisdiction of the Commonwealth"; (2) Canada was not "uninsured" for purposes of the statute because it had sovereign immunity; and (3) the WCTF was not liable if an employee was entitled to workers' compensation benefits in any other jurisdiction,  Mass. Gen. Laws ch. 152 § 65(2)(e)(i), and Merlini was in fact entitled under Canadian law to such benefits under Canada's national workers' compensation system.

In 2016, Merlini sought review of the DIA Board's ruling from the Massachusetts Appeals Court ("MAC").  The MAC upheld the Board's ruling.  The MAC did so, however, only on the ground that, in consequence of the injury that Merlini suffered at the consulate, she had been entitled to benefits in another jurisdiction -- namely, Canada.  Thus, the MAC did not "address whether the Canadian government is subject to the jurisdiction of the Commonwealth or whether the Consulate was an 'uninsured employer' in violation of chapter 152."

Merlini did not appeal the MAC's ruling. Instead, in 2017, Merlini sued Canada for damages in federal district court in the District of Massachusetts pursuant to chapter 152. It is that suit that is the subject of this appeal.

Canada moved to dismiss Merlini's suit on jurisdictional grounds under Federal Rule of Civil Procedure 12(b)(1). Canada contended in its motion that it was entitled to foreign sovereign immunity under the FSIA and thus that the District Court lacked jurisdiction. Canada also separately moved to dismiss Merlini's suit under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Canada did so on the ground that the DIA Board's ruling that Canada was not "uninsured" was preclusive of Merlini's claim because the DIA Board had ruled on that basis that Canada "was not required to obtain local workers' compensation insurance or register with the state as a self-insurer and therefore could not be considered an uninsured employer" under the MWCA.

In opposing Canada's motion to dismiss, Merlini first asserted that two exceptions to the FSIA's presumption of foreign sovereign immunity applied: the "commercial activity" exception, 28 U.S.C. § 1605(a)(2),[1] and the "noncommercial tort" exception,

---

[1] This provision states that:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case in which the action is based upon a commercial activity carried on in the United

id. at § 1605(a)(5).[2]  Merlini thus contended that the District Court had jurisdiction over Canada.  Merlini also argued that she had stated a claim against Canada because the DIA Board ruling did not preclude her claim.

In December 2017, the District Court dismissed Merlini's complaint for lack of jurisdiction on the grounds that, pursuant to the FSIA, Canada is "'presumptively immune' from liability in federal courts of the United States" and that Merlini had failed to demonstrate that either of the two FSIA exceptions on which she

---

States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

[2] This provision states that:

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise encompassed in paragraph (2) [the "commercial activity" exception] above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to -- (A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or (B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

relied in contesting Canada's sovereign immunity applied.  Merlini
v. Canada, 280 F. Supp. 3d 254, 256, 258 (D. Mass. 2017) (quoting
Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993)).  The District
Court "decline[d] to address" Canada's separate contention that
Merlini had failed to state a claim for which relief could be
granted.  Id. at 259.  Merlini now appeals the District Court's
dismissal of her claim for lack of jurisdiction and also contends
that the dismissal of her claim may not be affirmed on issue
preclusion grounds.

## II.

We start by describing certain aspects of the
Massachusetts workers' compensation scheme, as codified by chapter
152 of the MWCA.  Those provisions figure prominently in the
parties' dispute over whether Canada is entitled to foreign
sovereign immunity in this case.

As a general matter, the MWCA bars an employee from suing
her employer for a work-related injury -- including one resulting
from a fellow employee's conduct -- when the employer is "insured"
within the meaning of the MWCA.  See Mass. Gen. Laws ch. 152 § 24.
The MWCA imposes this bar by providing that an employee waives the
"right of an action at common law . . . [with] respect to an injury
that is compensable under [the MWCA]" if the employer was insured
within the meaning of the MWCA at the time of the employee's hiring
or became insured prior to the employee's injury, unless the

employee preserves such a right by providing proper notice of the employee's intent to preserve it.  Id.

Chapter 152, however, sets forth a corollary to this bar.  It provides that, if an employer is not insured within the meaning of the MWCA, then an employee, generally, may bring a suit against the employer to recover for a workplace injury -- even if the conduct is caused by a fellow employee.  See Hanover Ins. Co. v. Ramsey, 539 N.E.2d 537, 538 n.3 (Mass. 1989) ("An employer who has failed to obtain workers' compensation insurance can be held liable essentially in all cases in which the employee can prove that he was injured in the course of his work.").

Moreover, chapter 152 makes clear that, in such a suit by the employee, the employer is deprived of asserting a host of important defenses that would ordinarily be available at common law, which effectively renders the employee's claim against the employer a "strict liability" claim.  See Doe v. Access Indus., Inc., 137 F. Supp. 3d 14, 16 (D. Mass. 2015); Coppola v. City of Beverly, 576 N.E.2d 686, 687 (Mass. App. Ct. 1991).  Section 66 of chapter 152 specifies the limitations on the defenses that are available as follows:

> Actions brought against employers to recover damages for personal injuries or consequential damages sustained within or without the commonwealth by an employee in the course of his employment . . . shall be commenced within twenty years from the date the employee first became aware of the causal relationship

between the disability and his employment.  In such actions brought by said employees . . . it shall not be a defense: 1. That the employee was negligent; 2. That the injury was caused by the negligence of a fellow employee; 3. That the employee had assumed voluntarily or contractually the risk of the injury; 4. That the employee's injury did not result from negligence or other fault of the employer, if such injury arose out of and in the course of employment.

Merlini contends that, because Canada is not insured (even as a self-insurer) within the meaning of chapter 152, she is entitled under chapter 152 to bring her suit against Canada for the workplace injury that she suffered.  And, she further contends, for that same reason, Canada is subject in her suit to the limitations on the defenses that are set forth in § 66.  Canada argues in response that, precisely because Merlini relies on § 66, it is entitled to immunity under the FSIA, even assuming that Canada does not qualify as being "insured" within the meaning of chapter 152.  Thus, Canada contends, Merlini's claim must be dismissed for lack of jurisdiction.

We must now decide whether Canada is right.  To do so, we must address Merlini's contention that Canada lacks foreign sovereign immunity in consequence of either of two exceptions to such immunity that the FSIA recognizes.

### III.

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in federal court." Universal Trading & Inv. Co. v. Bureau for Representing Ukrainian Interest in Int'l & Foreign Courts, 727 F.3d 10, 16 (1st Cir. 2013) (quoting Argentine Republic v. Amerada Hess Shipping Co., 488 U.S. 428, 439 (1989)). The FSIA establishes "a presumption of foreign sovereign immunity from the jurisdiction of the courts of the United States" that typically controls the jurisdictional question. Id. (citing 28 U.S.C. § 1330; Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 485 n.5 (1983)). Thus, as a general matter, "courts in the Unites States lack both subject matter and personal jurisdiction over a suit against a foreign sovereign." Id.

The FSIA does, however, set forth a list of express exceptions to the foreign sovereign immunity that it generally recognizes, such that foreign states are not immune from suit in federal court if one of those "enumerated exceptions to immunity applies." Id. (citing 28 U.S.C. §§ 1604, 1605, 1605A; Verlinden, 461 U.S. at 488). Merlini invokes two of those exceptions -- the "commercial activity" exception and the "noncommercial tort" exception -- in contending that Canada is not entitled to sovereign immunity from her suit.

We focus here on one of them, the "commercial activity" exception, 28 U.S.C. § 1605(a)(2), as we conclude that, contrary

to the District Court's ruling, this exception does apply.  This conclusion, moreover, precludes the "noncommercial tort" exception from applying.  <u>See</u> 28 U.S.C. § 1605(a)(5) (providing that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise encompassed in paragraph (2) [the "commercial activity" exception]").  Our review of the District Court's ruling on this score is de novo.  <u>Universal Trading</u>, 727 F.3d at 15.

### A.

The "commercial activity" exception provides in relevant part that "a foreign state is subject to jurisdiction in any case 'in which the action is <u>based upon a commercial activity</u> carried on in the United States by the foreign state.'"  <u>Fagot Rodriguez</u> v. <u>Republic of Costa Rica</u>, 297 F.3d 1, 5 (1st Cir. 2002) (emphasis added) (quoting 28 U.S.C. § 1605(a)(2)).  The inquiry into whether the exception applies -- at least in a case like this, in which the parties agree that the foreign state "carried on" the relevant action "in the United States" -- involves two steps.

The first step "requires a court to 'identify[] the particular conduct on which the [plaintiff's] action is based.'"  <u>OBB Personenverkehr AG</u> v. <u>Sachs</u>, 136 S. Ct. 390, 395 (2015) (alteration in original) (quoting <u>Saudi Arabia</u> v. <u>Nelson</u>, 507 U.S. 349, 356 (1993)).  In performing that threshold inquiry, "a court should identify that 'particular conduct' by looking to the 'basis'

or 'foundation' for a claim," which the court has variously described as "'those elements . . . that, if proven, would entitle a plaintiff to relief'" and as "the gravamen of the complaint." Id. (omission in original) (internal citations omitted) (quoting Nelson, 507 U.S. at 357).

This inquiry requires more than a myopic focus on whether "one element" of the claim is based upon a "commercial activity" of the foreign state. See id. at 394-96. The right approach looks beyond the fact that a single element of the claim might be "based on" such conduct and instead "zeroe[s] in on the core of" the plaintiff's claim. Id. at 396.

After a court identifies the particular conduct by the foreign state on which the plaintiff's claim is "based," the next step in the inquiry requires a court to determine whether that conduct qualifies as "commercial activity." Fagot Rodriguez, 297 F.3d at 5. If the conduct does so qualify, then the "commercial activity" exception to foreign state sovereign immunity applies, at least when, as in this case, the parties do not dispute that the conduct was "carried on" by the foreign state "in the United States."

"The term 'commercial activity' encompasses both 'a regular course of commercial conduct' and 'a particular commercial transaction or act.'" Id. (quoting 28 U.S.C. § 1603(d)). As we have explained, however, "the question is not whether the foreign

- 13 -

government [was] acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives," but "[r]ather, the issue is whether the particular actions that the foreign state perform[ed] (whatever the motive behind them) [were] the type of actions by which a private party engages in 'trade and traffic or commerce.'" Id. at 6 (alterations in original) (quoting Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992)).  Thus, "[i]n assessing whether a certain transaction or course of conduct is commercial in character, courts must look to the 'nature' of the activity rather than its 'purpose.'"  Id. at 5-6; see also 28 U.S.C. § 1603(d) ("The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.").

Against this legal background, the key questions concerning the "commercial activity" exception that we must address in this appeal are the following: what conduct is Merlini's claim against Canada "based on," and is that conduct "commercial activity"?  We turn, then, to those two questions, starting with the first.

**B.**

In taking up the first question, we begin by observing that Canada does not dispute that it employed Merlini at its consulate in Boston, that she is an American citizen and not a

Canadian citizen, that her employment involved only duties that "were purely clerical," and that her employment lacked indicia of diplomatic or civil service.[3]  Nor does Canada contest, for purposes of this appeal, that Merlini was injured while performing her ordinary clerical duties as Canada's employee in the consulate in Boston.

Thus, if Merlini's complaint is "based on" Canada's employment of her as a clerical worker doing routine clerical work at the consulate in Boston, then the "commercial activity" exception would appear to apply.  See H. Rep. No. 94-1487, at 16 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6615 (describing "[a]ctivities such as a government's . . . employment or engagement of laborers, clerical staff or public relations or marketing agents . . . [as] those included within the definition [of commercial activity]" (emphasis added)).  In fact, Canada does not appear to argue otherwise.

The State Department, in its amicus brief, however, contends that Merlini's complaint is solely "based on" the negligent conduct by her fellow employee that caused the injury that she suffered during the course of her employment -- namely,

_____

[3] As already mentioned, Canada does not contend that Merlini had governmental, consular, diplomatic, or official duties; took a competitive examination before hiring; or was entitled to tenure protections or the employment benefits Canadian foreign service officers receive.

what she alleges in her complaint to have been the negligent laying of the cord by that employee.  The Department then contends that this conduct does not qualify as "commercial activity" and thus that the "commercial activity" exception does not apply.  Rather, the Department contends, the "noncommercial tort" exception is the only exception that might apply in Merlini's case, insofar as her action under § 66 can be characterized -- notwithstanding the fact that it strips the employer of asserting an absence of negligence as a defense -- as one that seeks recovery "against a foreign state for personal injury . . . caused by [a] tortious act or omission." 28 U.S.C. § 1605(a)(5) (emphasis added).  The Department thus argues that we should vacate and remand to permit Merlini to develop her claim of negligence under the "noncommercial tort" exception.

        To establish the premise on which this contention rests -- namely, that the suit is based solely on the conduct of Merlini's fellow employee with respect to the speakerphone cord -- the Department invokes the Supreme Court's opinion in Saudi Arabia v. Nelson.  There, the plaintiff argued that his claims of torture and false imprisonment at the hands of the Saudi Arabian government were "commercial" in nature because it was his employment with the Saudi Arabian government that "led to" those injuries.  Nelson, 507 U.S. at 358.  The Supreme Court, however, disagreed.  In so deciding, the Court held that it was wrong to

characterize the plaintiff's claims as being "based on" "commercial activity" simply because "commercial activity" "preceded" the conduct from which those claims arose.  Id. Instead, the Court stressed that while the plaintiff's employment may have "led to" his injuries at the hands of the Saudi Arabian government in a temporal sense, the actions that effectuated those injuries were in no way tied to that employment and were, therefore, not "commercial" in nature.  Id.  The Department argues that the same conclusion is required here.

We disagree.  The MWCA requires that Merlini prove only that she was injured in the workplace in the course of her employment with Canada.  Consequently, Merlini is not required to prove -- as the plaintiff in Nelson was required to prove as to his claims for battery, unlawful detainment, wrongful arrest and imprisonment, false imprisonment, inhuman torture, disruption of normal family life, and infliction of mental anguish -- any action by any person that caused the underlying injury.  She has to prove, instead, that she suffered a workplace injury in the course of her employment and that the defendant, Canada, was her employer.  Given that courts have held that an employer's maintenance of a hostile or discriminatory work environment constitutes "commercial activity" for the purposes a Title VII suit against an employer, 42 U.S.C. § 2000e-2(a), -- see, e.g., Holden v. Canadian Consulate, 92 F.3d 918, 922 (9th Cir. 1996); Ashraf-Hassan v. Embassy of

France in United States, 40 F. Supp. 3d 94, 102-03 (D.D.C. 2014) -- we fail to see why that same logic does not apply to Merlini's § 66 claim against her employer for workplace injuries suffered by employees during the course of their employment. Hers is no more an ordinary slip and fall case than those cases are ordinary harassment cases. Each rests on a claim that makes the employer directly liable for what happens in the workplace to the employee who brings the suit.

To be sure, the Supreme Court has stressed that to find the gravamen of any personal injury suit, one must look to "the point of contact -- the place where the boy got his fingers pinched." Sachs, 136 S. Ct. at 397 (internal quotations omitted). However, nothing in that precedent requires that we assess that conduct independent of the plaintiff's actual claim, which, in this case, is a claim against the employer -- not a fellow employee -- and requires no proof that any fellow employee engaged in any particular conduct.

We find the D.C. Circuit's analysis in El-Hadad v. United Arab Emirates instructive in this regard. 496 F.3d 658 (D.C. Cir. 2007). There, the Court held that that the gravamen of the plaintiff's complaint, which alleged breach of contract for wrongful termination, involved "commercial activity," in part, because it occurred in the "employment context." Id. at 663. In choosing to focus on the "employment relationship . . . as a

whole," the Court noted that a "narrow[er]" framing of the gravamen of the complaint -- focusing myopically on the plaintiff's defamation or breach of contract claims divorced from the employment context -- would "defy analysis" under the "commercial activity" inquiry. Id. at 663 n.1 (highlighting the difficulty of characterizing a "breach of contract," without more, as "commercial" or "non-commercial").

Simply put, Merlini's employment did not simply "le[ad] to" the injury that she received; it provides the legal basis for the only cause of action that she has against her employer for the injury for which she seeks to recover. See In re Opinion of the Justices, 34 N.E.2d 527, 544 (Mass. 1941) (establishing that chapter 152 §66 "must be interpreted as creating a cause of action in an employee sustaining an injury 'in the course of his employment' that is a 'direct result' of such employment though not a 'direct result of any negligence on the part of the employer'").

We recognize that, as the Department notes, the Supreme Court did not reject all of Nelson's claims on the ground that his allegations of "commercial activity" (his employment) preceded the actual conduct causing his injuries. Instead, in both Nelson and the Court's subsequent decision in Sachs, the Supreme Court noted that, with respect to the plaintiffs' failure to warn claims, the exception triggering activities (Nelson's employment and Sachs's

ticket purchase) were necessary elements of those claims. Nonetheless, the Court concluded in both cases that the failure to warn claims were impermissible because they were "merely . . . semantic ploy[s]," Nelson, 507 U.S. 9 at 363, "artful[ly] pled[]," Sachs, 136 S. Ct. at 396, to avoid the foreign states' sovereign immunity.

Insofar as the Department means to argue that Merlini's claims are, in some way, a similar "semantic ploy" to avoid Canada's sovereign immunity, no such concerns exist here. Merlini's chapter 152 claim was not part of some shrewd litigation strategy aimed at navigating around Canada's sovereign immunity. It was, instead, the only claim that Merlini could bring against her employer for the workplace injury that she suffered under the statutory framework established by the Massachusetts legislature for permitting employees to seek redress for such injuries from their employers. That framework has, as one of its express aims, the goal of incentivizing employers to comply with the law's worker's compensation requirement so that employees are ensured adequate coverage in situations where they are injured during the course of their employment. See In re Opinion of the Justices, 34 N.E.2d at 543-44 (describing the "manifest[] . . . purpose" of chapter 152 as "leav[ing] non-subscribing employers in such a disadvantageous position that hardly any employer could afford not to accept the insurance provisions of the act").

Thus, even if we were to accept that the gravamen of Merlini's complaint does not encompass Canada's choice to forgo obtaining the requisite insurance, we still would find that the "commercial activity" exception applies. And that is because the conduct on which her claim is based cannot be divorced from her "employment relationship" with Canada.

In so deciding, though, we emphasize that we reach this conclusion because Merlini is a United States citizen -- and not a citizen of Canada -- whom Canada employed to work for it as clerical staff in the United States. Accordingly, Merlini is just the type of employee whose employment by a foreign state Congress identified as an example of "commercial activity" by a foreign state. See H. Rep. No. 94-1487, at 16 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6615. Nor does Canada argue that there is anything about Merlini's duties that supports a different conclusion. We thus do not mean to suggest that the outcome would be the same if Merlini's position were not purely "clerical." See Kato v. Ishihara, 360 F.3d 106, 110-14 (2nd Cir. 2004) (characterizing "product promotion for Japanese companies" as "governmental" and, therefore, noncommercial); Butters v. Vance Intern., Inc., 225 F.3d 462, 465 (4th Cir. 2004) (characterizing "[p]roviding security for the royal family" of Saudi Arabia as "sovereign" and, therefore, noncommercial).

## C.

We turn, then, to Canada's contention, which it also made to the District Court, that "[t]he circumstances of [Merlini's] employment, and whether Canada could or should have prevented the alleged accident," are "incidental and immaterial under [Merlini's] theory of the claim."  Canada points to the fact that Merlini is relying in bringing her claim on chapter 152 § 66, which provides that "[a]n employer is liable in tort to an employee without proof of negligence if the employer is required to maintain workers' compensation insurance and fails to do so (or fails to become a licensed self-insurer) . . . ."  Thorson v. Mandell, 525 N.E.2d 375, 377 (Mass. 1988).

Canada argues that Merlini's reliance on § 66 is of critical importance in determining the gravamen of her complaint. Canada contends that, due to her reliance on that provision of chapter 152, Merlini is necessarily bringing a claim that is "based on" "how Canada provides workers' compensation benefits," given that her claim necessarily depends on the fact that Canada chose to compensate her through a means that does not qualify an employer as "insured" under chapter 152.[4]  (Emphasis added).

---

[4] Notably, Canada does not dispute the fact that this activity was conducted by the Canadian government, nor does it dispute that it was performed in the United States.

- 22 -

The District Court appeared, at least at points, to agree with Canada that the conduct that we must assess to determine whether it is "commercial" in nature is Canada's "decision to provide benefits directly under its own [national workers' compensation insurance] system."  In particular, the District Court, after describing "[t]he determinative question" at the first step of the inquiry as being "whether [Canada's] decision not to purchase workers' compensation insurance is commercial in nature," ultimately concluded that Canada's "decision to provide its own benefits does not fall under the commercial activit[y] exception because the decision to create and organize a workers' compensation program is sovereign in nature."  Merlini, 280 F. Supp. 3d at 257 (emphasis added).

The State Department, in its amicus brief, also endorsed this position as an alternative to its argument that the gravamen of Merlini's claim is more appropriately characterized as a "noncommercial tort."  The Department contends that "Canada opted out of the Massachusetts workers' compensation system in a manner available exclusively to sovereigns -- by enacting a statute creating an alternate and uniform compensation regime for all Canadian employees, wherever in the world they might be."

But, while Canada and the District Court are right that Merlini's claim does rely on § 66, nothing in § 66, or, for that matter, the whole of chapter 152, makes how an "uninsured" employer

chooses to compensate an injured employee of any relevance to a chapter 152 claim for damages against that employer. Chapter 152 requires, in relevant part, only that an employee must show "that [the employer] had to carry worker's [sic] compensation insurance" for an employee and "that [the employer] did not carry it." Beath v. Nee, 74 Mass. App. Ct. 1119, 1119 (2009) (unpublished). The statute does not require any showing regarding what alternative means, if any, the employer may have used to compensate the employee once the employee has shown that the employer was not insured within the meaning of chapter 152. Thus, while we must "zero[] in on the core" of her claim, Sachs, 136 S. Ct. at 396, and while we may not unduly seize upon merely one element of her claim, see id. at 394-96, Merlini's claim is in no sense "based on" Canada's decision to compensate her through its own national workers' compensation system. See Sachs, 136 S. Ct. at 395 (explaining that "a court should identify . . . those elements . . . that, if proven, would entitle a plaintiff to relief, . . . and the gravamen of the complaint" (internal citations omitted)).

That is not to say, though, that we reject Canada's contention that its decision to forgo insurance forms part of what may be understood to be the gravamen of Merlini's claim. We may assume that it does. Cf. Nelson, 507 U.S. at 358 n.4. But, even if we do, we cannot ignore that Canada failed to obtain what Massachusetts courts describe as "workers' compensation

insurance," see LaClair v. Silberline Mfg. Co., Inc., 393 N.E.2d 867, 869 (Mass. 1979), and that Merlini's claim is based on the fact that she is an employee who was injured during the course of her employment while her employer failed to possess that type of insurance. See El-Hadad, 496 F.3d at 663 (declining to divorce the conduct on which a breach of contract claim was based -- the breach -- from the "employment context" in which it occurred). Thus, even accepting that the gravamen of Merlini's claim relates to Canada's failure to obtain the requisite insurance, our inquiry into whether it is based on "commercial activity" would require us to examine whether that failure -- given the employment context in which it occurred -- constitutes "commercial activity."

In so doing, we must keep in mind that the characterization of conduct as "commercial activity" turns on its "nature" rather than its "purpose." 28 U.S.C. § 1603(d). Thus, a sovereign's conduct constitutes "commercial activity" if "the particular actions that the foreign state perform[ed] (whatever the motive behind them) [were] the type of actions by which a private party engages in 'trade and traffic or commerce,'" Fagot Rodriguez, 297 F.3d at 6 (alterations in original) (quoting Weltover, 504 U.S. at 614). Applying that test, we conclude that Canada's employment of Merlini without obtaining the requisite insurance is properly deemed to be "commercial activity," at least given that Merlini is a United States citizen whom Canada employed

in Boston as clerical staff and that she seeks recovery for the injury she suffered while performing her clerical duties.[5]

### 1.

We start by considering whether, in general, an employer's failure, in employing its workers, to be insured within the meaning of chapter 152 is the type of conduct "by which a private party engages in 'trade and traffic or commerce.'"  Fagot Rodriguez, 297 F.3d at 6 (quoting Weltover, 504 U.S. at 614).  We have little doubt that it is.

Private employers in Massachusetts must regularly decide whether, in employing their workers, they should obtain the kind of insurance that chapter 152 contemplates or whether they instead should take the risk of going bare.  See, e.g., Brown v. Leighton, 434 N.E.2d 176 (Mass. 1982) (uninsured taxicab driver employer); Barrett v. Transformer Serv., Inc., 374 N.E.2d 1325 (Mass 1978) (uninsured transformer service company employer); Truong v. Wong, 775 N.E.2d 405 (Mass. App. Ct. 2002) (uninsured tofu manufacturing

---

[5] Although we recognize that courts are instructed to give "special attention" to the State Department's views on matters of foreign immunity, see Jam v. Int'l Finance Corp., 139 S. Ct. 759, 770-71 (2019) (quoting Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l. Drilling Co., 137 S. Ct. 1312, 1320 (2017)), we are aware of no authority that would instruct us to adopt the Department's views if we conclude -- as we do here -- that they would have us run afoul of the statutory instruction that we not permit the purposes behind foreign state actions to serve as proxies for the nature of those actions.  28 U.S.C. § 1603(d); Weltover, 504 U.S. at 614.

plant employer).   That decision by employers about their approach to insuring themselves against their employees' workplace injuries impacts the overall financial wellbeing of the employers' businesses and generally concerns parties (namely, their businesses' employees) who have commercial expectations about the recourse that they will have against their employers in the event that they suffer a workplace injury.   See, e.g., Truong, 775 N.E.2d at 408 (establishing that the corporation president did not purchase workers' compensation insurance because it was "too expensive"); see also Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic, 877 F.2d 574, 580-81 (7th Cir. 1989) (describing the commercial obligations that arise out of traditionally private, third-party transactions).[6]

In recognizing the commercial nature of this choice by a business to go bare in employing someone, we do not mean to question whether Canada was in so "choosing" -- while nonetheless employing Merlini, a United States citizen, as a clerical worker

---

[6] Of course, it may be that, in some instances, a private business's failure to become insured within the meaning of chapter 152 is less the product of a commercial choice than a commercial oversight, see, e.g., O'Dea v. J.A.L., Inc., 569 N.E.2d 841 (Mass. App. Ct. 1991) (employer alleged to be uninsured due to a policy lapse), especially given how disadvantageous such a decision would appear to be for the employer.   But, such an oversight still takes place in the course of the business's employment of its workers and in parallel with its business judgments about how to protect against the commercial losses that might be incurred in consequence of those workers suffering a workplace injury.

in its consulate in Boston -- motivated by what it characterizes as its sovereign obligation to provide its employees protection through its own national workers' compensation system. In fact, Canada asserts that it has no legal authority -- given the limitations that it contends that Canadian law imposes -- to act otherwise. But, in light of the Supreme Court's decision in Weltover, it is clear that the "motive behind" Canada's conduct in employing Merlini without obtaining the requisite insurance is not germane to the question of whether the activity of doing just that is "commercial" for purposes of the FSIA's "commercial activity" exception. Fagot Rodriguez, 297 F.3d at 6 (quoting Weltover, 504 U.S. at 614); see also 28 U.S.C. § 1603(d).

In Weltover, the plaintiffs brought a breach of contract claim against Argentina after it defaulted on its bonds. Weltover, 504 U.S. at 610. Argentina argued in response that foreign sovereign immunity protected it from the suit, pointing to the fact that the bonds were not issued for the ordinary commercial purpose of "raising capital or financing acquisitions" but instead as instruments for refinancing sovereign debt. Id. at 616. According to Argentina, these refinancing measures were required as part of the government's program for addressing its domestic debt crisis. Id. Argentina thus argued that its decision not to repay the bonds was part of a governmental policy undertaken for sovereign rather than commercial reasons and therefore that the

claim was based on activity that could not qualify as commercial for FSIA purposes.  Id. at 616-17.

The Supreme Court rejected Argentina's contention.  Id. at 617.  According to the Court, Argentina had defaulted on what it termed "garden-variety debt."  Id. at 615.  Argentina's bonds, like private bonds, were negotiable, were traded on international markets, and came with the promise of future repayment.  Id.  Thus, for purposes of determining whether Argentina's default on those bonds was "commercial activity," the Court explained that Argentina's participation in the bond market was of a type that was commercial in nature and thus that it was "irrelevant why Argentina participated in the bond market."  Id. (emphasis in original).

Canada, of course, did not issue bonds.  But, it did employ a United States citizen as clerical staff in its Boston consulate, thereby engaging in conduct that it does not dispute qualifies as being "commercial" in nature.  Nor does Canada dispute that private businesses, when employing such clerical workers, are subject to the very same obligation to obtain insurance in compliance with chapter 152 -- insofar as they wish to avoid being subjected to personal injury suits such as Merlini brings -- or that their employment of such workers without having such insurance, as applied to those businesses, constitutes an activity that is commercial in nature.

We thus do not see how Canada's maintenance of a "garden-variety" employment relationship with Merlini while not maintaining such insurance is an activity that is any less "commercial" in nature than was Argentina's default on "garden-variety" debt in <u>Weltover</u>. In each case, the foreign state can point to a sovereign "purpose" in acting as it did. But in neither case does that reason speak to the "nature" of the foreign sovereign's conduct.[7] As a result, Canada provides no more reason

---

[7] The dissent argues that, in attempting to identify the "nature" of Merlini's claim, we ignore the "outward form of [Canada's] conduct," which the dissent characterizes as "informing Merlini that she was subject to the GECA . . . , compensating her pursuant to the GECA's benefits scheme after she made a claim of injury, and not continuing her benefits when Canada's Workplace Safety and Insurance Board (WSIB) determined after a full process that Merlini was ready to return to work." However, none of these actions constitutes the "outward conduct" that forms the basis of Merlini's claim against the Canadian government. The only "outward conduct" on Canada's part that Merlini needs to prove to succeed in her claim is defined by the elements of the claim that § 66 permits her to bring. Those elements make clear that she must prove that Canada was her employer in Massachusetts when she suffered the workplace injury for which she seeks recompense and that Canada did not comply with the state's workers' compensation requirements while having her in its employ. In fact, had Canada registered as a self-insurer in compliance with chapter 152, it could have performed each of the "outward" actions that the dissent outlines and Merlini would not have had a claim that she could bring under Massachusetts law. This point shows that the "outward conduct" described by the dissent is simply immaterial to the claim that Merlini brings here, such that her claim can in no sense be understood to be "based on" it. She has a cause of action under Massachusetts law against Canada for the workplace injury that she suffered only because Canada employed her and, as her employer, did not comply with the state's workers' compensation requirements. Because that kind of conduct is the kind of conduct that private employers engage in regularly it is conduct that is

for us to conclude that its conduct is "sovereign" rather than "commercial" than Argentina provided for the Court in Weltover.

Moreover, we note that, in deciding Weltover, the Supreme Court relied in part on the Seventh Circuit's reasoning in Rush-Presbyterian. Weltover, 504 U.S. at 614. There, Greece had entered into contracts with American doctors but then only partially paid them for their services. Rush-Presbyterian, 877 F.2d at 575-76. The Greek government pointed out that it had assumed these obligations as part of its comprehensive scheme to provide healthcare to all of its citizens. Id. at 580. According to Greece, the fact that its healthcare system was not profit-seeking, was funded by taxpayers, and operated through its own set of administrative proceedings, placed Greece's activity in retaining the doctors' services -- and thus its alleged failure to pay them fully for those services -- squarely in the realm of sovereign rather than "commercial activity." Id. at 580-81.

The Seventh Circuit disagreed. The court made clear that "private parties in the United States enter such agreements routinely" and that "the 'basic exchange' of money for health care services is the same" whether the payer is a government or a private employer. Id. at 581. The court thus ruled that Greece's

---

properly characterized as "commercial activity," at least given Merlini's particular attributes as a United States citizen working in the Boston consulate as clerical staff.

reasons for characterizing its conduct as noncommercial related only to the purpose underlying Greece's decision to enter into the contracts with the doctors and then not to pay them fully, rather than to the nature of the decision to enter into those contracts or to breach them.  Id. at 580.  And, for that reason, the Seventh Circuit rejected Greece's contention that the "commercial activity" exception did not apply.

Here, Canada, like Greece, entered into a contract for commercial services -- in this case, in the form of its employment contract with Merlini, given that Canada does not dispute the "commercial" nature of Canada's employment of her as clerical staff at the consulate.  And, then, after having done so, Canada, like Greece, failed to do what state law required of employers engaged in such typical commercial employment relationships -- namely, in this case, to be "insured" within the meaning of chapter 152 in employing Merlini.

To be sure, the existence of Canada's own national workers' compensation system may explain Canada's motive for making a type of decision regularly made by private commercial actors.  But, the existence of the foreign sovereign's system of social insurance in Rush-Presbyterian helped to explain the purpose behind that sovereign's failure to undertake a duty commonly required of employers engaged in commercial employment

relationships.   Yet, Rush-Presbyterian makes clear that such a fact does not thereby alter the commercial nature of that failure.

**2.**

Notwithstanding Weltover and Rush-Presbyterian, Canada contends that this case is actually more closely analogous to both Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020 (D.C. Cir. 1997) and Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek, 600 F.3d 171 (2d Cir. 2010), in which the "commercial activity" exception was held not to apply.   See Jungquist, 115 F.3d at 1024; Anglo-Iberia, 600 F.3d at 176.   Neither case, however, supports Canada's position.

In Jungquist, the D.C. Circuit held that the "commercial activity" exception was inapplicable to claims brought against officials of the government of the United Arab Emirates for actions that those officials took in administering the Abu Dhabi medical program in compliance with the Crown Prince Court's orders.  115 F.3d at 1020.   Specifically, the court determined that the officials engaged in no "commercial activity" with the plaintiffs, but instead "fulfilled [the government's] obligations to the [plaintiffs] by performing their official tasks as administrators." Id. at 1030.

In Anglo-Iberia, the Second Circuit held that the "commercial activity" exception did not apply to claims against the Indonesian government for a fraud perpetrated by its employees

in their capacities as administrators of the state-owned social security insurer, Jamsostek.  600 F.3d at 174.  The court noted that providing insurance is an activity that both the government and private markets perform.  But, the court explained, Jamsostek did not operate like a private insurer and therefore its wrongful administration of that government-run insurance program did not qualify as "commercial activity."  Id. at 176.

The reason that neither Jungquist nor Anglo-Iberia aids Canada's cause is simple.  In each of those cases, the claims at issue were based on the defendants' administration of the government programs at issue independent of any conduct by the foreign state as the employer of the plaintiffs, such that it was the manner of the administration of those programs -- and not the manner of the foreign state's employment of the plaintiffs -- that was alleged to be wrongful.

Merlini's claim is quite distinct.  Even on Canada's account, insofar as Merlini's claim is based on more than Canada's employment of her at the consulate or the conduct that caused the injury that she suffered there, her claim is still based on the Canadian government's decision to employ her for clerical work at the Boston consulate while not having the insurance contemplated by chapter 152.  Thus, her claim is not based -- as the claims at issue in Jungquist and Anglo-Iberia were -- on any allegation that foreign state officials acted wrongfully in administering a

governmental program independent of the foreign state's employment of the plaintiff in circumstances in which such employment concededly constitutes "commercial activity."

In that respect, Merlini's claim is no different from the claims that other employees have brought against private business employers that, like Canada, have not insured themselves in the manner chapter 152 specifies for the injuries that their workers may suffer in the workplace. The existence of Canada's own nationally administered program for compensating workers like Merlini, in other words, only provides the justification for the conduct by Canada on which Merlini's claim is based. But that justification speaks to Canada's "purpose" in engaging in that conduct and not to the "nature" of the conduct itself.

In fact, if Canada and the dissent's views prevailed, we struggle to understand what recovery for workplace harm -- whether concerning wages, benefits, or discriminatory treatment -- an employee of a foreign government, who, like Merlini, is a United States citizen employed as a clerical worker, could seek from the employer under the "commercial activity" exception recognized in the FSIA. Yet, it is quite clear that Congress, in enacting the "commercial activity" exception to foreign state immunity in the FSIA, contemplated that some employees of foreign governments would be entitled to recover for workplace harm against their foreign state employer -- namely, those employees that, like

Merlini, are United States citizens employed in clerical positions. See H. Rep. No. 94-1487, at 16 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6615 (describing "[a]ctivities such as a government's . . . employment or engagement of laborers, clerical staff or public relations or marketing agents . . . [as] those included within the definition [of commercial activity]").  Nor are we aware of any precedent supporting the notion that employees like Merlini lose their right to recover against their foreign state employer whenever that foreign employer establishes rules different from ours for protecting them.[8]

**3.**

Finally, Canada contends that a ruling that it must comply with the MWCA's insurance requirements or be stripped of many common law defenses in any suit claiming damages for a

---

[8] The dissent relatedly argues that the "commercial activity" exception should not apply to Canada in this context because, due to Canada's own workers' compensation law, the government was not allowed to comply with Massachusetts' insurance requirements under chapter 152.  We fail to see how Canada's legislative prohibition against obtaining the type of insurance that would qualify Canada as being "insured" for purposes of chapter 152 renders the act of not acquiring compliant insurance any less "commercial" in nature. As we have already argued, while Canada's sovereign workers' compensation regime clearly provides the <u>motivation</u> for its decision not to acquire compliant insurance under chapter 152, that motivation does not strip Canada's decision not to provide the requisite insurance of its "commercial" <u>character</u>, any more than the presidential decree directing Argentina to default on its bonds stripped that act of its "commercial" character in <u>Weltover</u> by way of constituting executive action.  See <u>Weltover</u>, 504 U.S. at 610.

workplace injury brought by an employee against the employer would "produce an absurd result." Such a conclusion, Canada contends, would essentially force Canada to subject itself to having Massachusetts assess its solvency through semi-annual audits and various deposit requirements. According to Canada, that kind of intrusion into its finances "would violate basic principles of comity" that foreign sovereign immunity exists to protect. Thus, for this reason, too, Canada contends, the "commercial activity" exception cannot be construed to apply here.

We may, for present purposes, set aside the fact, which Canada does not contest, that some foreign consulates as well as the Quebec Government Office in Boston, which is a political subdivision of Canada for the purposes of FSIA applicability, apparently have obtained the insurance required by chapter 152. The more fundamental point is that Canada's concerns about "comity" do not provide a basis for concluding that it is immune from suit in this case.

As Canada rightly points out, the "FSIA's objective is to give protection from the inconvenience of suit as a gesture of comity." Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co., 137 S. Ct. 1312, 1322 (2017) (internal quotations omitted) (noting that the FSIA was drafted with comity concerns in mind). But, by including the "commercial activity" exception in the FSIA, Congress made clear that those concerns do

- 37 -

not provide a reason to extend that protection to foreign states with respect to a suit that the "commercial activity" exception encompasses. Thus, an appeal to comity cannot in and of itself explain why a foreign state's conduct that is encompassed by that exception should be treated as if it is not.

Perhaps there is a case to be made that such comity concerns are relevant to a merits determination -- as a matter of Massachusetts or federal law -- that chapter 152's "insurance" requirement does not apply to a foreign sovereign in the same way that it applies to private employers. But, FSIA immunity applies only if, under the analysis that we must apply, see Weltover, 504 U.S. at 614; Fagot, 297 F.3d at 5-6, the conduct on which Merlini's claim is based is not "commercial" in nature. And, for the reasons that we have explained, the conduct here is commercial in nature, even though it may have been undertaken for sovereign reasons. Canada's appeal to comity, therefore, adds nothing to its argument, which we otherwise reject, that the "commercial activity" exception does not apply here. And thus, Canada's comity concerns provide no basis for concluding that Canada enjoys an immunity from this suit pursuant to the FSIA such that no federal court even has jurisdiction to make a merits judgment.

In its amicus brief, the State Department advances many similar "comity" concerns to those presented by Canada. But, although we give "special attention" to the State Department's

views on matters of foreign policy, see Jam, 139 S. Ct. at 770-71, we decline to place much weight on those views here. The Department itself does not view recovery by an employee like Merlini under § 66 against a foreign state employer to be necessarily adverse to United States foreign policy interests, given that it argues to us that Canada might lack immunity from Merlini's claim under the FSIA's "noncommercial tort" exception, 28 U.S.C. § 1605(a)(5). And, as we have explained, the Department sets forth no basis in the legislative history or text of the FSIA -- or in any precedent construing it -- for finding that Canada is immune from a suit under § 66 that is brought by a clerical worker like Merlini.

## IV.

Having determined that the FSIA does not prohibit Merlini's suit, Canada argues that we should nevertheless affirm the District Court's dismissal on a ground not reached by the District Court. Specifically, Canada argues that Merlini has failed to state a claim upon which relief can be granted, see Fed. R. Civ. P. 12(b)(6), because the DIA Board's ruling operates to preclude Merlini's suit.

The parties agree that we apply Massachusetts issue preclusion law. In re Baylis, 217 F.3d 66, 70-71 (1st Cir. 2000). Canada contends that the DIA Board's conclusion that "Canada is not uninsured in violation of [the MWCA]" should be entitled to

preclusive effect and thus bars Merlini's "relitigation" of that issue in federal court.

In order for an issue to have preclusive effect in a later proceeding under Massachusetts law, the following elements must be present: (1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication and essential to the earlier judgment. See Kobrin v. Bd. of Registration in Med., 832 N.E.2d 628, 634 (Mass. 2005); see also In re Baylis, 217 F.3d at 71. An order from a state agency is considered to be a final judgment for issue preclusion purposes, however, only if it is unappealed. See, e.g., Almeida v. Travelers Ins. Co., 418 N.E.2d 602, 605 (Mass. 1981) (noting that the determination of an agency is not binding for preclusion purposes after it has been appealed). And here, Merlini appealed the DIA Board's ruling to the MAC. Thus, it is to the MAC's ruling that we must look.

The MAC's ruling, however, is of no help to Canada's contention that Merlini's claim must be dismissed on issue preclusion grounds. In affirming the DIA Board's order, the MAC did so only on one ground -- namely, that Merlini was not entitled to recover from the WCTF because she was eligible for benefits in another jurisdiction. The MAC expressly stated that it was not

ruling on whether Canada was subject to the jurisdiction of Massachusetts or whether the consulate was an "uninsured" employer in violation of chapter 152.  For that reason, the MAC's "judgment is conclusive [only] as to the first determination." In re Baylis, 217 F.3d at 71.  And, given that Canada makes no argument, just as it made none to the District Court, that the judgment as to the issue that the MAC did decide is preclusive of Merlini's claim, Canada's argument for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds of issue preclusion fails. See P.R. Tel. Co., Inc. v. San Juan Cable LLC, 874 F.3d 767, 770 (1st Cir. 2017), cert. denied, 138 S. Ct. 1597 (2018) (holding that any argument not raised in the party's brief is deemed waived).

**V.**

For the foregoing reasons we **reverse** the District Court's grant of Canada's motion to dismiss and **remand** the case for further proceedings.  The parties shall bear their own costs.

**-Dissenting Opinion Follows-**

**LYNCH, Circuit Judge, dissenting.** In this important case affecting this country's foreign relations, I respectfully disagree with my colleagues. The majority holds that Canada is stripped of its sovereign immunity under the commercial activity exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 et seq. I disagree.

This suit is based on Merlini's disagreement with the decision of her employer, the Canadian consulate in Boston, not to provide her with extended workers' compensation benefits, having provided her with basic benefits. That decision by Canada is required by a Canadian legislative act, under which Canada has chosen to provide its own workers' compensation system to all consulate employees, regardless of nationality. I believe Canada's actions are protected from suit by the FSIA. Even if the suit could be viewed as based not on a legislative act, but only on an administrative act by Canada in its decision not to give Merlini an extension on her benefits, Canada is still protected by sovereign immunity.

Further, I think the policy implications of the majority's view are grave. What is sauce for the Canadian goose under the majority's holding will prove to be a bitter sauce for the American gander. The majority view will, I believe, operate to the detriment of the United States. Compelling Canada to abide by Massachusetts state law, at the expense of maintaining its own

workers' compensation scheme, will redound to the harm of the U.S. government's functions abroad, as I discuss later.

Because a sovereign state is "presumptively immune from the jurisdiction of United States courts" under the FSIA, Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993), the burden falls upon Merlini to demonstrate that an exception applies, see Universal Trading & Inv. Co. v. Bureau for Representing Ukrainian Interest in Int'l & Foreign Courts, 727 F.3d 10, 17 (1st Cir. 2013) (citing Virtual Countries, Inc. v. Republic of S. Afr., 300 F.3d 230, 241 (2d Cir. 2002)). I agree with the district court that this burden has not been met. See Merlini v. Canada, 280 F. Supp. 3d 254, 258 (D. Mass. 2017). I set out my reasons below.[9]

### I.

I first consider the text and meaning of the FSIA. The FSIA, enacted in 1976, "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." Sullivan v. Republic of Cuba, 891 F.3d 6, 9 (1st Cir. 2018) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488

---

[9]    I do agree with, and join, the majority in rejecting the State Department's arguments in its amicus brief that (1) Merlini's complaint is based only on the negligent conduct of her fellow employee in laying the phone cord that Merlini tripped over and so (2) we should vacate and remand for Merlini to make a negligence claim under the noncommercial tort exception. But, as discussed later, I agree with aspects of the State Department's brief, particularly concerning this country's activities abroad.

U.S. 428, 443 (1989)).  According to the Supreme Court, "the [FSIA's] manifest purpose [is] to codify the restrictive theory of foreign sovereign immunity." <u>Nelson</u>, 507 U.S. at 363.[10]  In a case cited approvingly by the <u>Nelson</u> Court, the Second Circuit carefully laid out the scope of the restrictive theory, which safeguards immunity for "traditionally . . . quite sensitive" actions including "internal administrative acts" and "legislative acts." <u>Victory Transp. Inc.</u> v. <u>Comisaria Gen. de Abastecimientos y Transportes</u>, 336 F.2d 354, 360 (2d Cir. 1964).  And the <u>Nelson</u> Court quoted from a much-cited law review article by a leading commentator, stating, "[S]uch acts as legislation . . . cannot be performed by an individual acting in his own name.  They can be performed only by the state acting as such." <u>Nelson</u>, 507 U.S. at 362 (quoting Hersch Lauterpacht, <u>The Problem of Jurisdictional Immunities of Foreign States</u>, 28 Brit. Y.B. of Int'l L. 220, 225 (1952)).

Under the FSIA's commercial activity exception, a foreign state is not immune from suit in a case

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state

---

[10]    Indeed, just months before the passage of the FSIA, the Supreme Court noted that "it is fair to say that the 'restrictive theory' of sovereign immunity appears to be generally accepted as the prevailing law in this country." <u>Alfred Dunhill of London, Inc.</u> v. <u>Republic of Cuba</u>, 425 U.S. 682, 703 (1976).

> elsewhere; or upon an act outside the
> territory of the United States in connection
> with a commercial activity of the foreign
> state elsewhere and that act causes a direct
> effect in the United States.

28 U.S.C. § 1605(a)(2).[11]

As the first step in considering this exception, we must "identify[] the particular conduct on which [Merlini's] action is 'based' for purposes of the [FSIA]." Nelson, 507 U.S. at 356. This requires "zero[ing] in on the core of the[] suit," OBB Personenverkehr AG v. Sachs, 136 S. Ct. 390, 396 (2015), without focusing merely on "a single element of a claim," id. at 395.[12]

---

[11]    The majority states correctly that its holding on the commercial activity exception, see 28 U.S.C. § 1605(a)(2), "precludes the noncommercial tort exception from applying." See id. § 1605(a)(5).

I consider the noncommercial tort exception briefly on the merits here. As the district court pointed out, the noncommercial tort exception expressly does not apply to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A); see Fagot Rodriguez v. Republic of Costa Rica, 297 F.3d 1, 8 (1st Cir. 2002); Merlini, 280 F. Supp. 3d at 258. Canada's decision to enact a particular workers' compensation scheme clearly is a discretionary legislative decision and is a decision "based on considerations of public policy." Berkovitz v. United States, 486 U.S. 531, 537 (1988). Following the Supreme Court, we must avoid "judicial 'second guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814 (1984). Thus, Merlini's argument that Canada's conduct falls within the exception for noncommercial torts is unavailing.

[12]    In Sachs, the Court unanimously held that the commercial exception did not apply to a claim concerning a grievous injury

That is, a court must identify the "gravamen of the complaint." Id.

Here, when we properly "zero[] in on the core of [Merlini's] suit," id. at 396, we see that it was the sovereign decision by Canada to enact and administer its own compensation scheme, including for all workers at consulates,[13] that is the basis for plaintiff's claim of injury. Merlini seeks more in the way of workers' compensation than Canada has provided. I disagree with the majority's characterization of Canada's conduct as being "an employer's failure . . . to be insured" under state law, as

---

from a rail accident in Austria, and did not permit jurisdiction over the foreign state-owned railway. 136 S. Ct. at 393. The Court rejected the Ninth Circuit's reading of Nelson -- that the commercial activity exception was properly met so long as a single element of the claim met the exception -- and said again that courts must focus on the acts of the sovereign alleged to have injured the plaintiff. "[T]he mere fact that the sale of the Eurail pass would establish a single element of a claim is insufficient to demonstrate that the claim is 'based upon' that sale for purposes of § 1605(a)(2)." Id. at 395.

[13]    Consulates, like embassies, by their operation are not usual places. They embody actions by a sovereign exercising its sovereign powers; the consulate here is an extension of Canada. As Canada says, the "[c]onsulate's mission is to monitor and interpret political and economic issues in the New England area; represent Canadian sovereign interests on issues such as borders, security, and trade; and provide consular services to Canadian citizens in New England, among other functions." I certainly do not say that the FSIA question is resolved by the fact that the accident happened in a consulate and to a person employed by a consulate. But I think the majority gives insufficient attention to these facts.

though Canada were a private employer making a discretionary, market-based choice.[14]  The majority concludes that this is an ordinary commercial omission made by an employer who "take[s] the risk of going bare."  Thus, the majority asserts that Merlini's claim is "in no sense 'based on' Canada's decision to compensate her through its own national workers' compensation scheme."  In my view, the premise is wrong, and the conclusion is wrong.

To see why, one need only look to Canada's Government Compensation Act ("GECA"), R.S.C. 1985, c. G-5.  That Canadian statute not only establishes the exclusive framework for how local consulate staff, like Merlini, receive benefits, but it also sets forth the sole mechanism for appealing the denial of such benefits.  Accordingly, the GECA sets forth what the government of Canada has determined, in its sovereign discretion, to be the appropriate comprehensive workers' compensation scheme for all of its federal employees, at home and abroad.  It does not matter, as the majority posits, that Merlini held only an administrative position:  The GECA clearly applies to all "locally engaged" employees.  See id. § 7(1).

---

[14]    Canada argues that it does provide workers' compensation and that the chapter 152 definition of "uninsured" or "self-insured" employer is irrelevant to its immunity, contrary to what the majority suggests.  And Merlini's complaint argues not that the consulate was uninsured as a factual matter, but that it "was acting as a self-insurer without obtaining a [Massachusetts] license."

Important here, the GECA authorizes the government of Canada to compensate workplace injuries _only_ through the Canadian Consolidated Revenue Fund (if a local fund exists in the jurisdiction where the injury occurred), see id., or directly through the government of Canada, see id. § 7(2). The Act does not authorize any other means of compensation. As such, Canada, as Merlini's employer, was prohibited by law from purchasing local Massachusetts insurance. Nothing under the FSIA required the Canadian consulate to flout its own Canadian laws. Contrary to the majority, this issue is not, then, one of "motivation," but of a sovereign choice by Canada's legislature untethered from commercial activity (unlike, for example, the issuance and repayment of bonds).

To enforce Canada's uniform compensation scheme, the consulate had to forgo Massachusetts workers' compensation insurance. These "acts" -- of enforcing the Canadian uniform compensation scheme and of foregoing Massachusetts workers' compensation insurance -- are the same. It is mere semantics to disaggregate the two. Following the Supreme Court's interpretations in Nelson[15] and Sachs, then, Merlini's suit is "based upon" Canada's enforcement and administration of a uniform

---

[15]    In Nelson, discussed further in the following section, the Supreme Court held that the suit was "based upon a sovereign activity immune from the subject-matter jurisdiction of United States courts under the [FSIA]." 507 U.S. at 363.

compensation scheme, and not merely one aspect of Canada's conduct in enforcing and administering this scheme.

## II.

The second step of the commercial activity inquiry requires determining whether the conduct that the complaint is "based upon" is commercial rather than sovereign. The FSIA defines commercial activity as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). Thus, courts must assess "whether the particular actions that the foreign state performs . . . are the type of actions by which a private party engages in 'trade and traffic or commerce.'" Republic of Argentina v. Weltover Inc., 504 U.S. 607, 614 (1992) (quoting Black's Law Dictionary (6th ed. 1990)). Weltover requires that the "full context" be considered. Id. at 615.

The majority asserts that Canada's conduct cannot be framed as a Canadian legislative directive to have and enforce its own workers' compensation scheme because that goes to the "purpose" of Canada's conduct, and not its "nature." See 28 U.S.C. § 1603(d). I disagree. Although it can be "difficult . . . in some cases to separate 'purpose' (i.e., the reason why the foreign

state engages in the activity) from 'nature' (i.e., the outward form of the conduct that the foreign state performs or agrees to perform)," <u>Weltover</u>, 504 U.S. at 617 (emphasis omitted), that distinction here supports my view.

The "outward form of [Canada's] conduct" includes, among other things, informing Merlini that she was subject to the GECA (this was done before her accident and injury),[16] compensating her pursuant to the GECA's benefits scheme after she made a claim of injury, and not continuing her benefits when Canada's Workplace Safety and Insurance Board (WSIB) determined after a full process that Merlini was ready to return to work. Each of these actions was authorized, and, indeed, compelled by the GECA. I cannot see how a country enacting its own law as to its employees and then administering its own national compensation scheme under that law as to those employed at its embassies and consulates is not, by its "nature," a sovereign act. Put another way, the full administration of this scheme is not the "<u>justification</u> for the conduct by Canada on which Merlini's claim is based," it <u>is</u> the relevant conduct by Canada. The majority asserts that this conduct is "simply immaterial," and we should treat Canada, a sovereign

---

[16]    Merlini's complaint acknowledges that "the Consulate instructed all its American employees, including Merlini, to apply to the Government of Canada for benefits in the event of a workplace accident."

state, simply as an "employer" who just "did not comply with the state's workers' compensation requirements."  I disagree, and view this conduct as clearly material to Merlini's claim.[17]    The majority, then, narrowly focuses on Merlini's employment and Canada's failure to have workers' compensation insurance under Massachusetts state law, which I do not see as the relevant "course of conduct": Canada's sovereign, full administration of its workers' compensation scheme.

The majority thrice cites to a single sentence in the House Report about "employment or engagement" of clerical staff, as though it provides support for its conclusion.  See H. Rep. No. 94-1487, at 16 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6615. It does not.

The full text of that paragraph of the report states:

> The courts would have a great deal of latitude in determining what is a '[commercial] activity' for purposes of this bill. It has seemed unwise to attempt an excessively precise definition of this term, even if that

---

[17]    The majority also says that, "had Canada registered as a self-insurer in compliance with chapter 152, it could have performed each of the 'outward' actions" that I list and "Merlini would not have had a claim that she could bring under Massachusetts law."    That counterfactual is not relevant to the majority's assertion that "none of these actions constitutes the 'outward conduct' that forms the basis of Merlini's claim against the Canadian government."    The existence of an alternative form of compliance with a Massachusetts statute (or, put another way, a method for a sovereign state to stave off lawsuits) does not change the character of Canada's acts from sovereign to commercial, nor does it mean that these acts are not the relevant conduct by Canada underlying Merlini's claim.

> were practicable.  Activities such as a
> foreign government's sale of a service or a
> product, its leasing of property, its
> borrowing of money, its employment or
> engagement of laborers, clerical staff or
> public relations or marketing agents, or its
> investment in a security of an American
> corporation, would be among those included
> within the definition.

Id.  This history does not support the majority's use of it.  This case is not about whether Canada complied with local law when it hired Merlini.  No such dispute is before us.  Merlini was hired; this dispute is about workers' compensation and Canada's choice of the workers' compensation it provides for its employees.  Nothing in the legislative history says that any dispute about post-employment compensation for workplace injuries is within the exception for commercial activity.  This case is about Canada's sovereign choice of a comprehensive workers' compensation scheme (a scheme which did compensate Merlini).  Canada chose to cover all people employed at its consulates, whether U.S. citizens or nationals of other countries, under its own scheme.

Further, Canada's action is not the "type of action[] . . . which a private party [would] engage[] in," id. at 614.  That is so because no private party can administer such a national statutory scheme.

My understanding comports with the Supreme Court's holding and reasoning in a series of cases.  In Weltover, the Court held that Argentina's issuance of bonds known as "Bonods" was a

commercial act, even though its purpose was to restructure the country's debt, 504 U.S. at 609-10, because the government was acting "not as regulator of [the] market, but in the manner of a private player within it." Id. at 614. The Court looked at the "full context," id. at 615, and pointed to the fact that private parties regularly held and traded such "garden-variety debt instruments." Id.

In this case, the very opposite is true: The Canadian consulate's decision to comply with and enforce the workers' compensation scheme established by the GECA is precisely "the type of action[]" that a "regulator," not a private employer, engages in. Id. at 614. To be sure, a private employer can forgo purchasing workers' compensation insurance, but unlike Canada, it does not and cannot do so as part and parcel of enforcing a broader statutory scheme.

Next, in Nelson, the Court firmly rejected the argument that the recruitment and employment by Saudi Arabia of foreign nationals -- which was arguably a commercial activity, and may have led to the commission of intentional torts which injured the plaintiffs -- satisfied the commercial activity exception. 507 U.S. at 351. That is, the Court explicitly rejected the argument

that no more was required than "a mere connection with, or relation to, commercial activity." Id. at 358.

The Nelson court emphasized that "a foreign state engages in commercial activity for purposes of the restrictive theory only where it acts 'in the manner of a private player within' the market." Id. at 360 (quoting Weltover, 504 U.S. at 614). The Court cited several federal cases, some pre-FSIA, for the proposition that immunity extends "to a foreign state's 'internal administrative acts.'" Id. at 361 (quoting Victory Transport, 336 F.2d at 360); see Herbage v. Meese, 747 F. Supp. 60, 67 (D.D.C. 1990), aff'd, 946 F.2d 1564 (D.C. Cir. 1991); see also Heaney v. Gov't of Spain, 445 F.2d 501, 503 (2d Cir. 1971) (reiterating immunity for legislative acts and administrative acts); Isbrandtsen Tankers, Inc. v. President of India, 446 F.2d 1198, 1200 (2d Cir. 1971) (same). Whether viewed as primarily legislative or administrative, Canada's conduct here remains sovereign.

The majority opinion, in my view, is also inconsistent with the Court's prior precedent and other circuit precedent. This circuit and others have rejected the majority's implicit premise that the nature of an action can be determined by an abstract consideration of whether some aspects of the broader governmental conduct are like those "which a private party engages in [during] 'trade and traffic or commerce.'" Weltover, 504 U.S. at 614. In

my view, private parties cannot create governmental workers'
compensation schemes and so Canada's actions are not like those of
private employers. But even if there were some likenesses to a
private employer's decision to self-insure, that would not be
enough to strip Canada of its immunity under fairly settled FSIA
law.

Several circuits have correctly found that even where
government conduct is determined to be like that in which private
parties can and do engage, the government conduct remains sovereign
when performed as part of a broader governmental program.

I think the majority's view is in conflict with the
Second Circuit decision in Anglo-Iberia Underwriting Mgmt. v. P.T.
Jamsostek, 600 F.3d 171 (2d Cir. 2010). There, the Second Circuit
held that an Indonesian state-owned insurer was entitled to
sovereign immunity against a negligent supervision claim because
neither Indonesia nor its state-owned insurer was engaged in a
commercial activity. Id. at 176. Even if the insurer were
arguably involved in a commercial activity overall, the challenged
activity (negligent supervision) was not sufficiently connected to
commerce. Id. at 179. That is, the state-owned insurer's "hiring,
supervision, and employment of" individuals as part of a

comprehensive national health insurance program was not a commercial act.  Id. at 178.

The Second Circuit's first holding was that the sovereign there, Indonesia, "does not sell insurance to workers or to employers in any traditional sense and does not otherwise compete in the marketplace like a private insurer."  Id. at 177 (internal quotation marks omitted).  Thus, it held that Indonesia's insurance scheme does not equate to that of an independent actor in the private marketplace of potential health insurers.  Instead, it determined that "the administration of Indonesia's national health insurance program" was "sovereign in nature."  Id. at 178. Here, Canada also does not compete in the marketplace as either seller or buyer, nor does it offer its workers' compensation program to private employees.

The Second Circuit's second holding was that "even if . . . administration of Indonesia's national health insurance program and [the state-owned insurer's] employment . . . were commercial in nature," the FSIA would not allow "abrogat[ing] a foreign sovereign's immunity solely on the basis of an employment relationship."  Id. at 179.  The majority attempts to distinguish Anglo-Iberia on this second holding, saying "the claims [there] were based on the defendants' administration of the government programs at issue," as it was "the manner of the administration . . . that was alleged to be wrongful."  It is, at

minimum, the administration by Canada of its own workers' compensation scheme that is at issue here, too.

And my view is that Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan further supports my point: The fact that actions can be done by private actors does not mean the actions fall within the commercial activity exception where such actions were nevertheless "uniquely sovereign in nature." 115 F.3d 1020, 1030 (D.C. Cir. 1997). There, the two officials who saw to the provision of the plaintiff's healthcare were "performing their official tasks as administrators of a government [health and welfare] program." Id. As here, then, the sovereign actions involved the "administrat[ion] of a government program [for health and welfare]." Id.

I also view the majority's conclusion as being at odds with rulings by the Ninth Circuit and D.C. Circuit. In Gregorian v. Izvestia, the Ninth Circuit held that the Soviet Union was entitled to sovereign immunity against a libel claim regarding a state-controlled newspaper. 871 F.2d 1515, 1522 (9th Cir. 1989). That the newspaper was sold and distributed in the United States did not render commercial the nature of its publication and distribution, as the "writing and publishing of articles reporting or commenting on events" remained governmental because the paper was state-owned and operated. Id. The D.C. Circuit held similarly that Peru was entitled to sovereign immunity for remodeling and

operating a building as a chancery allegedly in violation of local District of Columbia zoning laws, because the operation of a chancery was "by its nature governmental." MacArthur Area Citizens Ass'n v. Republic of Peru, 809 F.2d 918, 920 (D.C. Cir. 1987) (citation omitted).

In my view, it is incorrect to say that Merlini's claim is "no different from the claims that other employees have brought against private businesses that . . . have not insured themselves" under Massachusetts law. It is analytically incorrect, partly because the broader context must matter as to statutory interpretation and application of the FSIA. If that broader context did not matter, almost any governmental act could be disaggregated and framed as commercial conduct that a private party can perform.

Since what Canada has done here is a governmental act by its very nature, the majority cannot rely on Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic, 877 F.2d 574 (7th Cir. 1989), even if the case (whether rightly or wrongly decided) bears some initial resemblance. There, the Greek government was alleged to be in breach of a contract to reimburse physicians and an organ bank in Chicago for performing kidney transplants on Greek nationals. Id. at 575. The Seventh Circuit held that Greece's execution of the contract constituted "commercial activity," even though it was done to fulfill the government's constitutional goal

of caring for the health of Greek citizens, because "nothing about the provision of and payment for health services . . . is uniquely governmental." Id. at 581.

Not so here.  Canada's conduct, its enactment of a comprehensive workers' compensation scheme and decision not to award extended benefits, is the conduct at issue, and it is "uniquely governmental." Id. It is one thing for a government to engage in a private, commercial act (such as executing a contract) in order to fulfill a general governmental purpose (such as providing healthcare to its citizens).[18] It is quite another for a government to act in a manner strictly and precisely compelled by its own law to maintain the uniformity of its own federal workers' compensation program.  This distinction is important.

---

[18]    The Seventh Circuit in Rush-Presbyterian stated that "[u]nder the Greek constitution, the government has a broad obligation to provide health care services to Greek citizens." 877 F.2d at 575.  The Greek constitution does establish that "the State shall care for the health of citizens and shall adopt special measures for the protection of youth, old age, disability and for the relief of the needy." 2001 Syntagma [Syn.][Constitution] 21 (Greece) (trans). This language seems closer to stating a general sovereign purpose -- caring for health of citizens -- than a direct and precise mandate such as at issue in the GECA.
    In furthering this general constitutional goal, the Greek government maintains a wide range of possible options. And indeed, the Greek government has changed the precise cost and provision of healthcare numerous times since Rush-Presbyterian was decided, including, for example, eliminating health insurance for those who had been unemployed for more than two years as part of austerity measures. See Lucy Rodgers & Nassos Stylianou, How bad are things for the people of Greece, BBC News (July 16, 2015), http://www.bbc.com/news/world-europe-33507802.

I return to my sense of the foreign policy repercussions of the majority's view.  The U.S. has undertaken the same sovereign exercise abroad as to providing workers' compensation for U.S. embassy and consulate employees as has Canada.  For over a century, the U.S. has had a workers' compensation scheme for federal workers under the Federal Employees' Compensation Act ("FECA"), 5 U.S.C. § 8101 et seq.  FECA expressly covers "noncitizens and nonresidents" who are employees of the United States, such as employees at U.S. embassies and consulates abroad.  See id. § 8137. The State Department tells us that "many foreign nationals employed by U.S. embassies and consulates — including Canadian citizens employed by the United States in Canada — are currently entitled to workers' compensation benefits in virtue of United States law, not local law."  Like the GECA, U.S. law mandates that noncitizen, nonresident federal workers employed abroad are subject to federal U.S. workers' compensation law and procedures.  See id.  In addition to this statutory command, State Department regulations establish a "special schedule" for the compensation of such embassy and consulate workers, except in narrow circumstances.  20 C.F.R. § 25.2(b).

To say, then, that Canada is acting in a "commercial" manner when it imposes its own workers' compensation scheme would lead to the conclusion that our government's like actions as to employees of embassies and consulates abroad are similarly

commercial, not sovereign.  That, in my view, cannot be right.  A decision that Canada's actions are merely commercial risks providing cover for other countries to ignore sovereign actions taken by the U.S. and allow liability against the U.S. government concerning workers' compensation under local laws.  Indeed, the State Department's filing expresses concern with the U.S. "fac[ing] increased exposure in similar claims abroad."  I think it highly unlikely that Congress intended such a result in drafting the FSIA.  The effect of the majority's holding is to abrogate Canada's immunity from suit and force it to face a claim that Massachusetts can require Canada to get local insurance when Canada has made a sovereign decision to provide insurance itself through a comprehensive scheme.

Further, Merlini cannot escape from the fact that she is challenging Canada's imposition of its own compensation scheme in lieu of purchasing Massachusetts workers' compensation insurance. The majority finds little significance in the fact that Canada provided Merlini with compensation through Canada's own workers' compensation system.  Pursuant to the GECA, Merlini received compensation, in the form of full payment of her salary, from March until October 2009.  At that point, the WSIB determined that Merlini was able to return to work and terminated her benefits. Merlini chose not to appeal, which was open to her, and instead

began a decade-long legal battle in the U.S. to obtain additional benefits from Massachusetts and from Canada.

Finally, the majority also "emphasize[s]" throughout that Merlini is an American citizen, and states that it reaches its conclusion because of that fact. But that cannot limit the reach of its opinion in any way. The Massachusetts insurance statute, by its terms, applies to workers of all nationalities employed locally, not just U.S. citizens. So, by that logic, even the consulate's Canadian employees are subject to the state statute. The majority's attempt to cabin its opinion by stressing that Merlini is an American citizen does not work for yet another reason. The majority's attempted distinction based on citizenship of Canada's consular employees creates incentives to discourage Canada from employing Americans in its consulate, and imposes on Canada the costs and paperwork of administering different workers' compensation systems. In turn, the majority's attempted distinction would discourage American embassies abroad from employing local foreign citizens due to post-employment application of local workers' compensation law. But the choice to employ such citizens and the mix of the nationalities of employees at such consulates and embassies are sovereign choices.

If the majority thinks, as it says it does, that its result here, a denial of sovereign immunity, can be limited to low-level, "purely clerical" workers, I think that is mistaken.

The logic of its analysis leaves no room for that.  Further, there is no support in the text of the statute or the Supreme Court caselaw for such a distinction.  The same is true for any attempted limitation based on Merlini's American citizenship.

The purpose of sovereign immunity is to leave sovereign issues to the sovereigns, not to the courts.  I respectfully dissent.